**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>XAVIER BECERRA, SECRETARY OF HEALTH AND HUMAN SERVICES, *et al.*<br><br>*Defendants*. | Civil Action No. 1:21-cv-1395 |

**MEMORANDUM IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

      A.      Factual Background ........................................................................................................... 2

      B.      Procedural History ........................................................................................................... 6

LEGAL STANDARD ...................................................................................................................... 7

ARGUMENT ................................................................................................................................. 8

I.      The Accumulator Rule Will Harm Identifiable PhRMA Members ................................... 9

II.     The Accumulator Rule Will Cause Cognizable Harm to PhRMA Members ................... 13

CONCLUSION ............................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.N.S.W.E.R. Coal. v. Salazar*,
915 F. Supp. 2d 93 (D.D.C. 2013) ....................................................................................8

*Alston v. Johnson*,
208 F. Supp. 3d 293 (D.D.C. 2016) ................................................................................12

*Am. Chemistry Council v. Dep't of Transp.*,
468 F.3d 810 (D.C. Cir. 2006) .......................................................................................11

*Am. Petroleum Inst. v. Johnson*,
541 F. Supp. 2d 165 (D.D.C. 2008) ...............................................................................10

*Becker v. Fed. Election Comm'n*,
230 F.3d 381 (1st Cir. 2000) ..........................................................................................16

*Biotech. Indus. Org. v. District of Columbia*,
496 F.3d 1362 (Fed. Cir. 2007) ........................................................................................9

*Humane Soc'y of the U.S. v. Vilsack*,
797 F.3d 4 (D.C. Cir. 2015) .....................................................................................7, 14*

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ..........................................................................................................9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................................13

*NACS v. Bd. of Governors of Fed. Rsrv. Sys.*,
958 F. Supp. 2d 85 (D.D.C. 2013), *rev'd on other grounds*, 746 F.3d 474
(D.C. Cir. 2014) ..............................................................................................10, 11, 13*

*Nat'l Council for Adoption v. Pompeo*,
460 F. Supp. 3d 37 (D.D.C. 2020), *rev'd sub nom. Nat'l Council for Adoption
v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021)....................................................................7, 11

*Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .......................................................................................16

*Petro-Chem Processing, Inc. v. EPA*,
    866 F.2d 433 (D.C. Cir. 1989) ..................................................................................15, 16

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006) ..........................................................................................10

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................................7

*Scahill v. D.C.*,
    271 F. Supp. 3d 216 (D.D.C. 2017), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018) ..........................15

*Sierra Club v. E.P.A.*,
    292 F.3d 895 (D.C. Cir. 2002) ..........................................................................................10

*World Duty Free Americas, Inc. v. Summers*,
    94 F. Supp. 2d 61 (D.D.C. 2000) ......................................................................................14

**Statutes**

42 U.S.C. § 1396r-8(c)(1)(C)(i) .................................................................................................3

**Rules & Regulations**

42 C.F.R. § 447.505(c)(8) ..........................................................................................................4

42 C.F.R. § 447.505(c)(9) ..........................................................................................................4

42 C.F.R. § 447.505(c)(10) ........................................................................................................4

42 C.F.R. § 447.505(c)(11) ........................................................................................................4

84 Fed. Reg. 17,454 (Apr. 25, 2019) .........................................................................................3

85 Fed. Reg. 37,286 (June 19, 2020) .......................................................................................11

85 Fed. Reg. 87,000 (Dec. 31, 2020) ............................................................................. *passim**

Fed. R. Civ. P. 12(a)(2) ..............................................................................................................6

**Other Authorities**

HHS, *Statement on the Swearing-In of Chiquita Brooks-LaSure as Administrator
    of the Centers for Medicare and Medicaid Services* (May 27, 2021),
    https://www.hhs.gov/about/news/2021/05/27/statement-on-the-swearing-in-
    of-chiquita-brooks-lasure-as-administrator-of-the-cms.html......................................................6

iii

**INTRODUCTION**

Plaintiff, the Pharmaceutical Research and Manufacturers of America (PhRMA), is a trade association representing pharmaceutical manufacturers. Its Complaint in this case challenges a final rule that directly regulates pharmaceutical manufacturers. Effective January 1, 2023, that rule (the Accumulator Rule) will fundamentally change the way that manufacturers must calculate the rebates they pay to state Medicaid programs under the Medicaid rebate statute. In particular, the Accumulator Rule will require manufacturers to treat financial assistance that they provide to *patients* to help defray those patients' co-pays and other out-of-pocket costs as part of the "price" that manufacturers offer to *commercial health insurers*. Thus, the Accumulator Rule will require manufacturers to do one of three things: (1) design and implement changes to their patient assistance programs so that that assistance is not counted as part of the "price" offered to health insurers under the new regulations (if such changes are even possible), (2) leave their assistance programs unchanged but incur new compliance costs and risk higher Medicaid rebate liabilities, or (3) stop offering financial assistance to patients altogether, even though that assistance is critical to enabling patients to afford to purchase manufacturers' products.

Despite not disputing any aspect of the preceding paragraph, the government moves to dismiss for lack of standing under Rule 12(b)(1), rhetorically asking PhRMA, "What's it to you?" Mem. 2 (citation omitted). The answer to that question is self-evident. The government first asserts that PhRMA's Complaint does not "name" a specific PhRMA member that will be harmed by the Accumulator Rule. Mem. 1. But when the Accumulator Rule was proposed, numerous individual PhRMA members submitted public comments stating that—if finalized, as it later was—the Accumulator Rule would harm them by forcing them to incur compliance costs, pay higher rebates, and/or restructure or abandon their patient assistance programs. These comments are incorporated in the Complaint by reference and are part of the administrative record.

The government also asserts that PhRMA has not explained how the last of the three available options under the Accumulator Rule—eliminating patient assistance programs altogether—"would actually harm drug manufacturers." *Id.* Again, the answer is straightforward and should be self-evident: as the Complaint explains, without financial assistance from manufacturers, fewer patients will be able to afford the out-of-pocket costs required for manufacturers' products under patients' insurance plans. And fewer patients taking the medications prescribed by their doctors will naturally harm manufacturer sales and revenues in addition to resulting in worse outcomes for patients. If that were not enough, the preamble to the Accumulator Rule downplays the possibility that manufacturers will eliminate their patient assistance programs in response to the Rule, precisely because doing so would be harmful to manufacturers' competitive and economic interests. Because there is, at a minimum, a substantial risk that at least one PhRMA member will be harmed, PhRMA meets Article III's low bar for standing at the pleading stage.

For these reasons, PhRMA respectfully asks the Court to deny the government's motion to dismiss and to move expeditiously to the merits of this case.

## BACKGROUND

### A.    Factual Background

PhRMA members have long provided financial assistance to commercially insured patients to help defray those patients' co-pays and other out-of-pocket costs. This assistance benefits both the manufacturers who offer it and the patients who receive it, as Defendants the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) have both recognized. For manufacturers, "patient assistance programs serve as important marketing tools … to start a patient on a therapy, and to promote and maintain adherence once patients are taking their medications." 85 Fed. Reg. 87,000, 87,099 (Dec. 31, 2020). Such

assistance also helps patients "by encouraging adherence to existing medication regimens, particularly when copayments may be unaffordable to many patients." Compl. ¶ 87 (quoting 84 Fed. Reg. 17,454, 17,544 (Apr. 25, 2019)).

Separately, the Medicaid rebate program requires manufacturers to pay rebates to state Medicaid programs in order for their drugs to be eligible for federal Medicaid payments. *See id.*, ¶ 23. Under the Medicaid rebate statute, those rebates are calculated in part based upon the manufacturer's "Best Price"—defined as "the lowest price available from the manufacturer … to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States," with certain exclusions specified in the statute. 42 U.S.C. § 1396r-8(c)(1)(C)(i). In general, manufacturers' rebate liability and Best Price have an inverse relationship; if Best Price goes down, rebates go up, and if Best Price goes up, rebates go down.

Historically, HHS and CMS regulations have permitted manufacturers to exclude patient assistance from their determinations of Best Price, with the effect that patient assistance does not decrease manufacturers' Best Prices or increase their rebate liabilities. *See* Compl., ¶¶ 29-31. Two recent developments, however, are now changing how manufacturers' financial assistance to patients is treated in Best Price determinations. First, in recent years, and as explained more fully in PhRMA's Complaint, health insurers and pharmacy benefit managers have implemented systems known as "accumulator adjustment programs," which refuse to count the amount of manufacturer assistance toward satisfaction of the patient's annual deductible or out-of-pocket maximum for drug costs. *See id.*, ¶¶ 4-6, 38-39. These accumulator adjustment programs in effect use manufacturer assistance that is intended for patients to delay when an insurance benefit kicks in during a plan year. *See id.*

Second, in December 2020, HHS and CMS promulgated the Accumulator Rule, which requires manufacturers to include the value of assistance they provide to patients in their Best Price determinations, unless they somehow "ensure" that the full value of their assistance stays with the patient and is not captured by the patient's health insurer through an accumulator adjustment program. *See* 85 Fed. Reg. at 87,101-03; 42 C.F.R. § 447.505(c)(8)-(11). In the Rule, HHS and CMS acknowledge that technologies and systems necessary to bring manufacturers' patient assistance programs into compliance with the new regulatory requirements do not currently exist and would take time to design and implement (assuming they are even possible at all). The agencies accordingly delayed the effective date of the relevant regulatory changes until January 1, 2023, to "give manufacturers time to implement a system that will ensure the full value of assistance under their manufacturer-sponsored assistance program is passed on to the patient, such as contracting with a third party vendor to track their assistance when provided at the point of sale, or changing the structure of their manufacturer-sponsored assistance programs to require patients pay for the drug first and then have the patient collect the rebate directly from the manufacturer (outside of the electronic claims process)." 85 Fed. Reg. at 87,053.

In effect, the Accumulator Rule leaves manufacturers, including PhRMA members, with three choices, all of which would cause substantial economic harm: (1) design and implement operational changes to their patient assistance programs to ensure that the full value of the assistance stays with the patient and is not used to delay insurance benefits (if such changes are even possible), (2) retain their current assistance programs and accept the additional compliance costs and Medicaid rebate liabilities that the Rule imposes, or (3) stop offering patient assistance altogether, leaving some patients unable to afford the out-of-pocket costs required for manufacturers' products under their insurance plans. *See* Compl., ¶¶ 45-46 (discussing potential

operational changes to patient assistance programs); *id.*, ¶¶ 10, 13, 59, 65-66 (discussing compliance costs and higher rebate liabilities); *id.*, ¶¶ 13, 32-39, 42, 47, 65 (discussing possibility and consequences of eliminating patient assistance).    Before the Accumulator Rule was promulgated, PhRMA itself and numerous individual PhRMA members submitted public comments opposing the Rule and highlighting the harms it would cause to patients and manufacturers alike.  *Id.*, ¶¶ 42, 44.  But HHS and CMS finalized the Rule as proposed.  *Id.*, ¶ 43.

In responding to comments suggesting that the Accumulator Rule would cause manufacturers to curtail or eliminate their patient assistance programs, HHS and CMS repeatedly downplayed any suggestion that the Rule would have that effect.  In a section entitled "Viability of Manufacturer Assistance Programs With This Policy," for example, the agencies responded to "concern that the operational challenges to manufacturers would deter them from offering a broad range of manufacturer assistance" by asserting that they "do not agree that this regulation creates an insurmountable burden for manufacturers" and that they "expect[] … that manufacturers will work … to ensure that they have the information necessary to comply with this regulatory requirement."  85 Fed. Reg. at 87,054.  Similarly, in a section entitled "Regulatory Impact," the agencies acknowledged that "some manufacturers may eliminate, reduce, or restructure their programs as a result of this policy," but expressed "hope[] that manufacturers will not eliminate these programs."  *Id.* at 87,099.  The agencies explained that "patient assistance programs serve as important marketing tools for manufacturers" and asserted that "any changes manufacturers may make to their assistance programs may be in response to multiple factors," including "continued patient demand for this assistance given the increasing costs of new drugs" and "the need to respond to competition from other manufacturers."  *Id.*

## B.      Procedural History

PhRMA filed this action on May 21, 2021, against four defendants—Xavier Becerra, in his official capacity as Secretary of HHS; HHS itself; Liz Richter, in her then-official capacity as Acting Administrator of CMS;[1] and CMS itself.  *See* Compl., ¶¶ 19-22.  PhRMA's Complaint asserts a single cause of action, alleging that the Accumulator Rule is unlawful and invalid under the Administrative Procedure Act because it conflicts with the Medicaid rebate statute.  *See* Compl., ¶¶ 68-71.  On July 28, 2021, the government requested a 30-day extension until September 1, 2021, which PhRMA did not oppose and the Court granted.  Dkt. 8; Minute Order, Aug. 5, 2021; *see* Dkt. 6, 7; Fed. R. Civ. P. 12(a)(2).  On August 24, 2021, PhRMA moved for a consolidated briefing schedule on the government's anticipated motion to dismiss and PhRMA's anticipated motion for summary judgment.  Dkt. 9.

On September 1, 2021, the government moved to dismiss PhRMA's Complaint for lack of jurisdiction under Rule 12(b)(1), arguing that PhRMA lacks Article III standing to sue.  Dkt. No. 10, Mem. 1.  In a footnote, the government acknowledged the obligations imposed by Local Rule 7(n)(1), which required the government to "file a certified index of the contents of the administrative record with the Court … simultaneously with the filing of a dispositive motion." Local Rule 7(n)(1); *see* Dkt. No. 10*,*  Mem., 6-7 n.3.  But the government stated that it "d[id] not intend to file a certified copy of the index of the Administrative Record with this motion," claiming that "the record is not needed to decide this motion."  *Id.*

---

[1] On May 27, 2021, Chiquita Brooks-LaSure was sworn in as the Administrator of CMS.  *See* HHS, *Statement on the Swearing-In of Chiquita Brooks-LaSure as Administrator of the Centers for Medicare and Medicaid Services* (May 27, 2021), https://www.hhs.gov/about/news/2021/05/27/statement-on-the-swearing-in-of-chiquita-brooks-lasure-as-administrator-of-the-cms.html.  Ms. Brooks-LaSure accordingly was automatically substituted as a defendant in this case under Federal Rule of Civil Procedure 25(d).

On September 3, 2021, the government opposed PhRMA's motion for a consolidated briefing schedule and separately moved to stay briefing on PhRMA's anticipated motion for summary judgment until after resolution of the government's motion to dismiss. Dkt. 11, 12. On September 8, 2021, PhRMA moved to compel the government to comply with Local Rule 7(n)(1) by filing a certified index of the administrative record. Dkt. 13, 14.

On September 9, 2021, the Court granted the government's motion to stay summary-judgment briefing and also granted PhRMA's motion to compel compliance with Local Rule 7(n)(1). Minute Order, Sept. 9, 2021. The Court ordered the government to "file a certified list of the administrative record as soon as possible, and no later than 14 days after the filing of this order" and directed PhRMA to respond to the government's motion to dismiss "within 21 days of receipt of the certified list." *Id.* The government filed a certified list of the contents of the administrative record on September 23, 2021, Dkt. 15, five days before the filing of this opposition.

## LEGAL STANDARD

In resolving a motion to dismiss under Rule 12(b)(1) for lack of standing, the Court "accept[s] facts alleged in the complaint as true and draw[s] all reasonable inferences from those facts in the plaintiffs' favor." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). In doing so, the Court is entitled to rely on its "common sense." *Id.* And the Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 14 (D.D.C. 2018). Additionally, "the Court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Id.* at 11. The Court also may consider the administrative record. *See Nat'l Council for Adoption v. Pompeo*, 460 F. Supp. 3d 37, 47-48 (D.D.C. 2020) (considering administrative record in resolving motion to dismiss for lack of standing), *rev'd sub nom. Nat'l Council for Adoption v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021) (reversing on other grounds and

7

finding standing).  Of particular relevance here, the Court may consider materials outside the pleadings in determining whether a member of a plaintiff organization would have standing to sue in the member's own right.  *See A.N.S.W.E.R. Coal. v. Salazar*, 915 F. Supp. 2d 93, 102 (D.D.C. 2013).

## ARGUMENT

The government's motion to dismiss raises two main standing arguments, both of which are meritless.  First, the government argues that PhRMA's Complaint fails to name a specific PhRMA member that the Accumulator Rule will harm.  But PhRMA's standing is self-evident, as it is a trade association of pharmaceutical manufacturers, which are the principal parties the Accumulator Rule regulates.  And during the rulemaking process, numerous individual PhRMA members submitted public comments explaining how the Rule would harm them.

Second, the government argues that PhRMA's Complaint fails to explain why PhRMA members could not avoid any injury by simply eliminating their patient assistance programs altogether.  But both the Complaint and the face of the Accumulator Rule explain why manufacturers offer and benefit from assistance programs, which help patients afford the out-of-pocket costs required for manufacturers' products under their insurance plans.  And it is self-evident that being forced to eliminate an assistance program that manufacturers otherwise desire to maintain is an injury-in-fact sufficient to confer standing.  Indeed, the Rule itself explains that eliminating patient assistance is likely to be *more* harmful to manufacturers than the only two available alternatives—(1) restructuring assistance programs or (2) incurring new compliance

costs and risking higher rebate liabilities—both of which undisputedly result in harms sufficient to satisfy Article III standing requirements.[2]

## I.       The Accumulator Rule Will Harm Identifiable PhRMA Members

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The government does not dispute that PhRMA satisfies the second and third prongs of that test. *See* Mem. 7.  Nor could it.  PhRMA is seeking to protect the interests of its members in continuing to operate patient assistance programs and to be free from the improper compliance burdens and increased rebate liabilities imposed by the Accumulator Rule in violation of the Medicaid rebate statute.  Those interests are plainly germane to PhRMA's purpose as the principal policy advocate for innovative pharmaceutical manufacturers.  *See* Compl., ¶¶ 18, 67; *Biotech. Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1370 (Fed. Cir. 2007) (holding that PhRMA and another trade association had associational standing because they are "industry organizations who seek to shape policy in a manner favorable to member pharmaceutical and biotechnology companies, so the subject matter of this case [concerning pharmaceutical pricing] is highly germane to their respective purposes").  And this case does not require the participation of any individual PhRMA member because it is a facial challenge to a final rule based on the administrative record.  *Cf. id.* (holding that individual PhRMA members need not participate in a "facial challenge … against a generally applicable statute").

---

[2] The government also argues that PhRMA lacks organizational standing to sue on its own behalf. Mem. 11-13.  PhRMA is not asserting organizational standing in this case.

Instead, the government argues that PhRMA has not met the first prong of the associational standing test because it "fails to identify *any* specific member that has standing." Mem. 8. The D.C. Circuit, however, "has expressly rejected the use of" standing doctrine "as a procedural 'gotcha' in cases where standing was reasonably thought to be self-evident." *NACS v. Bd. of Governors of Fed. Rsrv. Sys.*, 958 F. Supp. 2d 85, 98 (D.D.C. 2013), *rev'd on other grounds*, 746 F.3d 474 (D.C. Cir. 2014). As one of the D.C. Circuit's leading standing precedents explains, "[i]n many if not most cases the petitioner's standing to seek review of administrative action is self-evident …. In particular, if the complainant is an object of the action … at issue—as is the case usually in review of a rulemaking …—there should be little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Sierra Club v. E.P.A.*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quotation marks omitted). Standing thus "is usually self-evident when the plaintiff is … an organization representing regulated parties." *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008). For example, the D.C. Circuit "has concluded that an association of oil refineries had standing to challenge an EPA regulation establishing air pollution standards because it was 'inconceivable' that the regulation 'would fail to affect ... even a single' member of the association." *Id.* (quoting *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895-96 (D.C. Cir. 2006)).

Here, PhRMA's standing is self-evident from PhRMA's Complaint because the Complaint properly alleges that PhRMA is an association of pharmaceutical manufacturers, Compl, ¶ 18, which are regulated parties under the Accumulator Rule, *id.*, ¶¶ 48, 65-67. The Accumulator Rule indisputably imposes obligations on pharmaceutical manufacturers. In the government's own words, the Accumulator Rule revises HHS and CMS's regulations "to expressly *require that 'the manufacturer* ensures the full value of the assistance or benefit is passed on to the patient' before

10

the manufacturer excludes the discount from its MDRP 'best price' calculation." Mem. 5 (emphasis added; ellipsis omitted) (quoting Compl., ¶ 41; 85 Fed. Reg. at 37,299). The preamble to the Accumulator Rule—which is incorporated into the Complaint by reference—includes multiple sections dedicated to discussing the ways in which the Rule will require manufacturers to alter their conduct. *See, e.g.*, 85 Fed. Reg. 87,053 ("Existence of Mechanisms To Assist Manufacturers With Compliance"); *id.* at 87,054 ("Viability of Manufacturer Assistance Programs With This Policy"). Indeed, the Rule's likely effects on manufacturers are so drastic that HHS and CMS delayed its effective date until January 1, 2023, in order to "give manufacturers time to implement a system that will ensure the full value of assistance under their manufacturer-sponsored assistance program is passed on to the patient." *Id.* at 87,053. It is inconceivable that the Accumulator Rule would not affect even a single PhRMA member.

If all of that were not enough, the standing of identifiable PhRMA members also is "'self-evident' from the administrative record." *NACS*, 958 F. Supp. 2d at 98 (*citing Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 822, 824 (D.C. Cir. 2006)); *see Nat'l Council for Adoption*, 460 F. Supp. 3d at 47-48. In particular, when the Accumulator Rule was proposed, no fewer than *nineteen* individual PhRMA members—more than half of PhRMA's total membership—submitted public comments stating that they would be harmed if the Accumulator Rule were finalized and allowed to go into effect. For example:

- Johnson & Johnson commented that the Accumulator Rule would make its patient assistance programs "exceedingly more difficult if not impossible to operate." A.R. 043539.

- Pfizer cautioned that the Rule would put into question the "viability of its patient assistance programs." A.R. 045392; *see also* A.R. 067220 (similar from Takeda).

- Amgen explained to CMS that compliance with the Accumulator Rule would be "impossible." A.R. 009179; *see also* A.R. 053656 (similar from Bayer); A.R. 054226 (similar from Biogen); A.R. 062197 (similar from Lundbeck).

11

- AstraZeneca told CMS that it may have to "withdraw, limit, and or decrease patient assistance programs" as a result of the Accumulator Rule.  A.R. 036446; *see also* A.R. 055205 (similar from Genentech); A.R. 043856 (similar from UCB).

- Bristol Myers Squibb warned CMS that the Rule could "discourage manufacturers from providing patient assistance."  A.R. 035289.

- Eli Lilly explained that the Rule would "[p]enaliz[e] manufacturers who seek to ameliorate deficiencies in commercial insurance benefit designs by forcing them to give away product to Medicaid."  A.R. 043419.

- Gilead wrote that the Rule "could force manufacturers to reduce the cost-sharing assistance they provide to patients or even stop providing such assistance altogether, increasing patients' exposure to the ever-growing cost-sharing required by plans."  A.R. 054410.

- GlaxoSmithKline explained how the Rule could force patients to "abandon" medications like those produced by the company.  A.R. 069806; *see also* A.R. 048779 (similar from Incyte); A.R. 009386-87 (similar from Novartis); A.R. 053994-95 (similar from Boehringer Ingelheim).

- Sanofi described how the Rule "would place manufacturers and patients in an impossible position with respect to copay assistance."  A.R. 053973.

- CSL Behring discussed how the Rule could "compel manufacturers to alter their patient assistance programs."  A.R. 044308.

All of these commenters are PhRMA members.  *See* Corporate Disclosure, Dkt. 2; *About*, PhRMA, phrma.org/en/About.  And the government has known about these comment letters all along—they were submitted to the agencies during the rulemaking process, are publicly available on www.regulations.gov, are included in the administrative record, and are incorporated by reference in the Complaint, *see* Compl. ¶ 44 (referencing "many comments received [by CMS] sounding the alarm about the Accumulator Rule"); *Alston v. Johnson*, 208 F. Supp. 3d 293, 298 (D.D.C. 2016) ("[A] document need not be mentioned by name to be considered 'referred to' or 'incorporated by reference' into the complaint." (citation omitted)).  The government's suggestion that HHS and CMS lacked notice about "even a single member injured by the rule," Mem. 8,

accordingly rings hollow.  To the extent the standing of PhRMA's members was not already self-evident from the Accumulator Rule itself, it was "reasonable for [PhRMA] to assume," *NACS*, 958 F. Supp. 2d at 99, that the agencies could glean that information from reading the public comment letters that nineteen of PhRMA's members submitted.  The government's first argument thus fails.

## II.    The Accumulator Rule Will Cause Cognizable Harm to PhRMA Members

The government next argues that any harm asserted in PhRMA's Complaint is "not cognizable and not traceable to the [Accumulator] Rule."  Mem. 9.  To establish Article III standing, a plaintiff must plead an injury-in-fact that is: (1) "actual or imminent" and "concrete and particularized," (2) "fairly traceable to the challenged action of the defendant," and (3) "redress[able] by a favorable decision" from the court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  The government does not contest that, to the extent the Accumulator Rule forces manufacturers either to (1) design and implement changes to their patient assistance programs or (2) leave those programs in effect but incur higher Medicaid rebates in the process— the first two of the three options open to manufacturers under the Rule—manufacturers suffer an injury-in-fact sufficient for Article III standing.  *See* Mem. 9-10.  Instead, the government argues that PhRMA "does not explain why 'forgoing offering financial assistance to patients'"—the third option open to manufacturers under the Rule—"constitutes a cognizable harm."  Mem. 10 (quoting Compl., ¶ 65).  In the government's view, eliminating patient assistance altogether is not harmful because "[m]anufacturers are not required to offer financial assistance to patients by discounting their drug prices, and the only harm [PhRMA] alleges from not offering a discount is to the patient, not to drug manufacturers."  *Id.*

The government is plainly wrong.  As the Complaint alleges repeatedly, without financial assistance from manufacturers, fewer patients will be able to afford the out-of-pocket costs required for manufacturers' products under their insurance plans.  *See, e.g.*, Compl., ¶ 2 (patient

assistance helps "patients afford the out-of-pocket costs … for the purchase of medicines"); *id.*, ¶ 13 (forgoing offering patients assistance leaves "patients without the ability to afford essential medications"); *id.*, ¶ 34 (patient assistance "is an important safety net for patients who need financial support to help them pay for medications").  And it is self-evident that fewer patients starting and adhering to the medications prescribed by their doctors will naturally harm manufacturer sales and revenues in addition to resulting in worse outcomes for patients.  That inference is eminently "reasonable" and accords with "common sense."  *Humane Soc'y*, 797 F.3d at 8.  Indeed, this Court has held that having "fewer customers" suffices not just to demonstrate Article III standing but can even show irreparable injury warranting a preliminary injunction. *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000).

HHS and CMS themselves admit in the preamble to the Accumulator Rule that eliminating patient assistance programs would harm manufacturers.  The Rule acknowledges that "patient assistance programs serve as important marketing tools for manufacturers to start a patient on a therapy, and to promote and maintain adherence once patients are taking their medications."  85 Fed. Reg. at 87,099.  The Rule further observes that there is "continued patient demand for this assistance given the increasing costs of new drugs" and that manufacturers would not even change their patient assistance programs, let alone eliminate them, without considering "the need to respond to competition from other manufacturers."  *Id.*  Simply put, being forced to discontinue an assistance program that provides a means to meet "continued patient demand" and to "respond to competition from other manufacturers" is a concrete injury-in-fact.  Indeed, HHS and CMS expressly "hope[]" and "expect[]" that manufacturers will maintain their patient assistance programs notwithstanding the burdens imposed by the Accumulator Rule, *id.* at 87,054, 87,099, precisely *because* eliminating those programs would be harmful to manufacturers' interests—more

harmful, the government estimates, than altering the programs to comply with the new regulatory requirements (if that is even possible) or incurring new compliance burdens and risking higher Medicaid rebate liabilities.  Again, those are the only two alternatives the Accumulator Rule leaves to eliminating patient assistance altogether, and the government does not dispute that *both* of those alternatives entail injuries sufficient to confer Article III standing.  If (as HHS and CMS concluded) eliminating patient assistance is *more* harmful to manufacturers than alternatives that themselves entail harm sufficient to confer standing, then eliminating patient assistance necessarily confers standing as well.

The government also asserts that "any manufacturer's decision to continue providing patient discounts … looks like a self-inflicted injury" not traceable to the Accumulator Rule.  Mem. 10.  That, too, is wrong.  Injury is considered self-inflicted for purposes of standing only "where the plaintiff's claimed injury [i]s *clearly independent* of agency action."  *Scahill v. D.C.*, 271 F. Supp. 3d 216, 230 (D.D.C. 2017) (emphasis added), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018).  In other words, the injury must be so "completely due to the [complainant's] own fault as to break the causal chain."  *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989).  Here, there is no basis to conclude that manufacturers would choose to eliminate their patient assistance programs "independent of" the Accumulator Rule.  To the contrary, the allegations in the Complaint and the public comments submitted by PhRMA's members and included in the administrative record establish that manufacturers currently offer financial assistance to patients, do not want to stop offering such assistance, and would consider doing so only if the Accumulator Rule were allowed to go into effect.  *See* Compl., ¶¶ 2, 13, 32-37, 47, 65-66; *supra*, pp. 11-12.

Nor is there any merit to the government's paternalistic suggestion that, by eliminating patient assistance, manufacturers could "increase revenues by charging a non-discounted price."

15

Mem. 10. That suggestion contradicts the Accumulator Rule's acknowledgement that patient assistance is an "important marketing tool[]" that helps manufacturers meet "continued patient demand" and "respond to competition." 85 Fed. Reg. at 87,099. In any event, it is sufficient for standing that manufacturers *believe* that patient assistance benefits patients and manufacturers alike and want to continue offering it unless forced to do otherwise. Being compelled to run a business the way the government (or its counsel) believes is best rather than the way the business's management believes is best is a paradigmatic Article III injury-in-fact. *See, e.g.*, *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 387-89 (1st Cir. 2000) (rejecting argument that FEC regulation that "affected the conduct of [a] campaign" caused only "self-imposed" harm because "clearly, one who challenges a governmental action may not be denied standing merely because his challenge in a sense stems from his own choosing").

The two cases the government cites in support of its "self-inflicted injury" argument are plainly inapposite. *Petro-Chem Processing v. EPA* involved a *loosening* of regulations; the court there held that a trade association lacked standing to challenge a regulation authorizing an allegedly dangerous method of hazardous waste disposal because members could "avoid [it] by choosing safer methods." 866 F.2d at 438. Here, the Accumulator Rule does not authorize pharmaceutical manufacturers to do anything; it creates new obligations for manufacturers, not new rights. And in *National Family Planning & Reproductive Health Association v. Gonzales*, the only asserted injury was "uncertainty" regarding a possible conflict between a regulation and a new statute, but the plaintiff association "ha[d] within its grasp an easy means of alleviating the alleged uncertainty" by simply petitioning the relevant agency to resolve the conflict. 468 F.3d 826, 831 (D.C. Cir. 2006). Here, there is no similar way for manufacturers to avoid injury—each of the three options available to manufacturers entails substantial harm to their interests. And PhRMA

16

and its members already tried to avoid those harms when they submitted numerous public comments opposing the proposed rule during the rulemaking process, but HHS and CMS finalized the Accumulator Rule as proposed.  PhRMA accordingly has Article III standing to challenge the Accumulator Rule, and the government's second argument fails.

## CONCLUSION

Both of the standing arguments in the government's motion to dismiss are inconsistent with the allegations in the Complaint, the face of the Accumulator Rule itself, and the public comments of PhRMA's members submitted during the rulemaking process.  For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss and should lift the stay on summary-judgment motions.  If the Court does so, PhRMA will be prepared to promptly file a motion for summary judgment.

DATED:  September 28, 2021.

Respectfully submitted,

/s/ Jeffrey L. Handwerker
Jeffrey L. Handwerker
  (D.C. Bar No. 451913)
R. Stanton Jones
Kristin M. Hicks
William C. Perdue
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000 (phone)
(202) 942-5999 (fax)
jeffrey.handwerker@arnoldporter.com

17